# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GEORGE SCOTT FAST,<br><br>        Plaintiff,<br><br>    v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>        Defendant. | Case No. 1:17-cv-00086-SAB<br><br>ORDER DENYING PLAINTIFF'S SOCIAL SECURITY APPEAL<br><br>(ECF Nos. 14, 18) |

## I.

## INTRODUCTION

Plaintiff George Scott Fast ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying his application for supplemental security income pursuant to the Social Security Act. The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to Magistrate Judge Stanley A. Boone.[1]

Plaintiff suffers from attention deficit hyperactivity disorder (ADHD), psychotic disorder, manic depressive disorder, paranoia, fatigue, dizziness, asthma, trouble breathing, bipolar disorder, and anxiety. For the reasons set forth below, Plaintiff's Social Security appeal shall be denied.

---

[1] The parties have consented to the jurisdiction of the United States Magistrate Judge. (See ECF Nos. 9, 22, 25.)

1

# II.

# FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff protectively filed a Title XVI application for supplemental security income on September 12, 2012. (AR 148-156.) Plaintiff's application was initially denied on March 22, 2013, and denied upon reconsideration on October 14, 2013. (AR 72-76, 80-84.) Plaintiff requested and received a hearing before Administrative Law Judge Laura Fernandez ("the ALJ"). Plaintiff appeared for a hearing on April 8, 2015. (AR 26-48.) On July 17, 2015, the ALJ found that Plaintiff was not disabled. (AR 8-20.) The Appeals Council denied Plaintiff's request for review on November 17, 2016. (AR 1-5.)

### A. Relevant Hearing Testimony

Plaintiff appeared with counsel and testified at the hearing on April 8, 2015. (AR 26-48.)

He did well in school until seventh grade, but he started doing poorly in seventh grade. (AR 40.) Plaintiff was paranoid of everything and the worst part of school was being in a group environment. (AR 40.) During middle school, he frequently got into fights and he did not have any real friends. (AR 40.) He did not trust anyone so he was constantly looking over his shoulder seeing what people were trying to say about him and he never focused on the actual subject in school. (AR 40.) He stopped attending school during his second year of tenth grade, which was after he completed two years of ninth grade. (AR 41-42.) At that time, he was 18 and he had lost interest. (AR 41.) He was not in special education classes. (AR 42.)

He attempted culinary vocational school, but the teacher said that he could not continue there because he had trouble focusing. (AR 42.)

Plaintiff is unable to work because he has trouble concentrating, focusing, memorizing, and remembering things from day to day, and he does not handle changes to routine very well. (AR 31, 41.) He has been diagnosed with attention deficit. (AR 42.) As far as he knows, he has not been prescribed any medications for his focusing and attention deficit, except he took Ritalin as a child. (AR 42-43.)

He has been going to Dr. Nguyen for a little over a year for treatment for depression and his bipolar. (AR 31-32.) He meets with Dr. Nguyen on a monthly basis and treatment has

consisted of figuring out medications and trying to "probe further into [his] actual problems." (AR 32.) He has been taking Celexa and Risperdal for 2 months and he finds a benefit taking them. (AR 32.) He feels it is a small benefit, but his parents say that he is much more present and he ventures out of his room more often. (AR 33.) He did not improve with his previous medication, Latuda. (AR 32.)

Dr. Nguyen instructs Plaintiff to do physical exercise and have a better diet, but Plaintiff has not complied. (AR 33.) Plaintiff states that it is difficult to comply with a special diet because he does not have the money to support a special diet. (AR 33.) He forgets to exercise most of the time because he gets so wrapped up in what he is doing, such as playing video games, talking to his brother who lives in another state, and keeping up with friends and a potential significant other online. (AR 33.)

During a typical day, he wanders around for a little while after waking up, sees if anything has happened in any of the chat rooms that he is currently in, and checks to see if there is anything new on YouTube. (AR 36-37.) He checks his usual websites and then starts playing his video games. (AR 37.) He switches between those activities until he goes to bed. (AR 37.)

He spends nearly all of his time in his room. (AR 35.) He plays video games, but he has difficulty concentrating when he is playing. (AR 33.) If it takes him longer than an hour to accomplish a specific goal, he will generally lose focus and interest in the particular goal, wander out of his room, and see what his parents are doing. (AR 33-34.) When he gets back to his room, he either has forgotten what he was doing or he halfheartedly picks the activity back up while looking for another activity to perform. (AR 34.) He gets easily distracted fairly often by his cats going into his room or if he hears his parents doing something. (AR 34.)

Besides video games, he checks the chat rooms that he is in with his friends and his brother and he looks online at the websites that he regularly checks. (AR 35.) He is unable to maintain concentration with these activities, especially with chatting. (AR 35-36.) He says that there is no real focus to browsing on the internet and if something interests him, he will spend at most 30 minutes on it. (AR 36.) Even when he watches a YouTube video of something he is particularly interested in, he will generally lose interest if it is more than 30 minutes long and he

will move onto another video or something else. (AR 36.) He has a cable box in his room, but he does not really watch TV. (AR 36.) He cannot stay focused on one thing for too long to really enjoy what he is watching. (AR 36.)

He has "good days," where he can concentrate for 2 or 3 hours, and "bad days," where he can concentrate for 20 to 40 minutes. (AR 34-35.) He estimates that he has "bad days" over half of the days in a month. (AR 35.) However, he can generally concentrate for 30 to 90 minutes. (AR 35.)

He has problems taking care of his personal needs and showering. (AR 36.) When he gets wrapped up in what he is doing or when he is losing interest in what he is doing, he tends to forget about his personal hygiene or needing to eat unless his parents have made him something. (AR 36.) Sometimes he forgets that his parents told him dinner was ready, so his parents bring him his food. (AR 36.) He gets reminders several times a week to take care of his hygiene and to eat. (AR 36.)

He "very, very rarely" leaves the house. (AR 37.) He leaves the house to go grocery shopping and go to doctor's appointments, and occasionally he gets a snack from the corner store. (AR 37.) Most of the time, he does not leave the house alone. (AR 37.) His mom and dad go with him for most things. (AR 37.)

If he lived by himself, he would barely be able to take care of himself and do all of the things that his parents help him with. (AR 37.) He has occasionally stayed home by himself when his parents have left town. (AR 37.) When this happens, he takes care of himself and the cats. (AR 37-38.) He feeds the cats and cleans up after them sometimes, but he forgets about himself. (AR 38.) He will make himself dinner between 1 and 3 times a week. (AR 38.)

He remembers to take his medications most of the time. (AR 38.) However, he does not take his medication on a regular schedule, because he takes them before bed and time that he goes to bed varies a lot. (AR 38.) He has difficulty sleeping. (AR 38.) He sleeps between 6 and 14 hours a night. (AR 38.) He thinks the large range is a tradeoff between an overactive brain where his mind is constantly racing and then being exhausted from lack of sleep. (AR 38.) He thinks his Risperdal makes him sleep longer than he should. (AR 38.) He has to take at least 1

nap a day and sometimes 2 or 3 naps a day. (AR 38-39.)

His mental symptoms have gotten progressively worse since he was a child. (AR 39.) He used to not have as many racing thoughts. (AR 39.) He has always had hyperactivity, but it was more of a physical hyperactivity. (AR 39.) It has now shifted to a mental hyperactivity where his brain simply does not turn off. (AR 39.)

The only work he has done was undocumented work helping a family friend picking olives at an orchard about 4 years prior to the hearing. (AR 39, 43.) After 2 days, he was left behind because he was too slow. (AR 39.) He could not stay focused and could not keep up with everyone else. (AR 39.) He knew what he was supposed to be doing, but he could not figure out how to pick the olives out of the tree the way that everyone else did it. (AR 39-40.)

He applied to work at Walmart 6 years prior to the hearing, but he was denied a position. (AR 43.) He has not looked for a job since applying to Walmart 6 years ago. (AR 43.)

Thomas Dachelet, a vocational expert ("VE"), also testified at the hearing. (AR 44-47.)

**B.     ALJ Findings**

The ALJ made the following findings of fact and conclusions of law.

- Plaintiff has not engaged in substantial gainful activity since September 12, 2012, the application date.
- Plaintiff has the following severe impairment: an affective disorder.
- Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments.
- Plaintiff has the residual functional capacity ("RFC") to perform a full range of work at all exertional levels but with the following nonexertional limitations: he is limited to simple, routine and repetitive tasks with occasional public contact. He can frequently respond appropriately to coworkers.
- Plaintiff has no past relevant work.
- Plaintiff was born on July 27, 1989, and was 23 years old, which is defined as a younger individual age 18-49, on the date the application was filed.
- Plaintiff has a limited education and is able to communicate in English.

1 | - Transferability of job skills is not an issue because Plaintiff does not have past relevant work.
- Considering Plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.
- Plaintiff has not been under a disability, as defined in the Social Security Act, since September 12, 2012, the date the application was filed.

(AR 8-20.)

## III.

## LEGAL STANDARD

To qualify for disability insurance benefits under the Social Security Act, the claimant must show that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security Regulations set out a five step sequential evaluation process to be used in determining if a claimant is disabled. 20 C.F.R. § 404.1520; Batson v. Commissioner of Social Security Administration, 359 F.3d 1190, 1194 (9th Cir. 2004). The five steps in the sequential evaluation in assessing whether the claimant is disabled are:

> Step one: Is the claimant presently engaged in substantial gainful activity? If so, the claimant is not disabled. If not, proceed to step two.
>
> Step two: Is the claimant's alleged impairment sufficiently severe to limit his or her ability to work? If so, proceed to step three. If not, the claimant is not disabled.
>
> Step three: Does the claimant's impairment, or combination of impairments, meet or equal an impairment listed in 20 C.F.R., pt. 404, subpt. P, app. 1? If so, the claimant is disabled. If not, proceed to step four.
>
> Step four: Does the claimant possess the residual functional capacity ("RFC") to perform his or her past relevant work? If so, the claimant is not disabled. If not, proceed to step five.
>
> Step five: Does the claimant's RFC, when considered with the claimant's age, education, and work experience, allow him or her to adjust to other work that exists in significant numbers in the national economy? If so, the claimant is not disabled. If not, the claimant is disabled.

Stout v. Commissioner, Social Sec. Admin., 454 F.3d 1050, 1052 (9th Cir. 2006).

Congress has provided that an individual may obtain judicial review of any final decision of the Commissioner of Social Security regarding entitlement to benefits. 42 U.S.C. § 405(g). In reviewing findings of fact in respect to the denial of benefits, this court "reviews the Commissioner's final decision for substantial evidence, and the Commissioner's decision will be disturbed only if it is not supported by substantial evidence or is based on legal error." Hill v. Astrue, 698 F.3d 1153, 1158 (9th Cir. 2012). "Substantial evidence" means more than a scintilla, but less than a preponderance. Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996) (internal quotations and citations omitted). "Substantial evidence is relevant evidence which, considering the record as a whole, a reasonable person might accept as adequate to support a conclusion." Thomas v. Barnhart, 278 F.3d 947, 955 (9th Cir. 2002) (quoting Flaten v. Sec'y of Health & Human Servs., 44 F.3d 1453, 1457 (9th Cir. 1995)).

"[A] reviewing court must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." Hill, 698 F.3d at 1159 (quoting Robbins v. Social Security Administration, 466 F.3d 880, 882 (9th Cir. 2006). However, it is not this Court's function to second guess the ALJ's conclusions and substitute the court's judgment for the ALJ's. See Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) ("Where evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld.").

## IV.

## DISCUSSION AND ANALYSIS

Plaintiff argues that the ALJ erred in giving greater weight to the state agency reviewing physicians, Eugene Campbell, PhD and A. Garcia, M.D., than the consultative examiner, Roger Izzi, a clinical psychologist/neuropsychologist.[2] Defendant counters that the ALJ properly gave partial weight to the opinions of Dr. Campbell, Dr. Garcia, and Dr. Izzi.[3]

---

[2] The Court notes that there is no treating medical opinion in the record as to Plaintiff's mental capacity. The only medical opinions regarding Plaintiff's mental impairments are Dr. Izzi, who performed a consultative examination, and Dr. Campbell and Dr. Garcia, who are state agency reviewing consultants.

[3] The Court notes that Plaintiff did not file a reply.

The weight to be given to medical opinions depends upon whether the opinion is proffered by a treating, examining, or non-examining professional. See Lester v. Chater, 81 F.3d 821, 830-831 (9th Cir. 1995). The opinion of an examining physician is entitled to greater weight than the opinion of a nonexamining physician. Lester, 81 F.3d at 830. "If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence." Garrison v. Colvin, 759 F.3d 995, 1012 (9th Cir. 2014) (citing 20 C.F.R. § 404.1527(d)(3)). The contrary opinion of a non-examining expert is not sufficient by itself to constitute a specific, legitimate reason for rejecting an examining physician's opinion, however, "it may constitute substantial evidence when it is consistent with other independent evidence in the record." Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001). "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989) (quoting Cotton v. Bowen, 779 F.2d 1403, 1408 (9th Cir. 1989)).

### A. The ALJ Provided Specific and Legitimate Reasons for the Weight Provided to Dr. Izzi's Opinion

Plaintiff argues that the ALJ erred in giving partial weight to Dr. Izzi's opinion because the ALJ did not provide specific and legitimate reasons. Plaintiff asserts that the record supports Dr. Izzi's opinion. Plaintiff also contends that the ALJ should have given greater weight to Dr. Izzi's opinion because Dr. Izzi observed Plaintiff during the examination, performed valid objective I.Q. testing, and performed memory testing.

Defendant counters that the ALJ reasonably gave partial weight to Dr. Izzi's opinion because Plaintiff spent hours a day playing video games, Plaintiff attended vocational training when motivated, and Plaintiff participated in a culinary vocational class not because of safety issues or inability to appear at class on time but because he was not ready to complete an intensive program. Defendant also points out that the ALJ agreed with Dr. Izzi's opinion that Plaintiff could perform simple tasks and that Plaintiff had a limited ability to get along with others.

1. **Lack of Concentration, Persistence, and Pace to Complete an 8-hour Day is Inconsistent with Plaintiff's Ability to Spend Hours Playing Video Games or, When Motivated, Attend Vocational Training**

The ALJ considered that Dr. Izzi opined that Plaintiff could perform simple and repetitive tasks, but he is not likely to have the concentration, persistence, or pace required to complete an 8-hour workday. (AR 16, 377.) The ALJ found that Dr. Izzi's opinion that Plaintiff could perform simple tasks was commensurate with the I.Q. testing showing borderline to average intelligence and Plaintiff's ability to read and spell at a twelfth grade level. (AR 16.) However, the ALJ found that Dr. Izzi's opinion that Plaintiff does not have the concentration, persistence, and pace to complete an 8-hour day seemed inconsistent with Plaintiff's ability to spend hours playing video games or when motivated, attend vocational training. (AR 16.)

Plaintiff argues that the ability to play video games does not mean that a person can maintain attention and concentration in a competitive work setting because even one-year-olds can play video games. The Court is determining whether the ALJ's interpretation that Plaintiff's ability to spend hours playing video games is inconsistent with an inability to have the concentration, persistence, and pace to complete an 8-hour day is rational. See Burch, 400 F.3d at 679. Plaintiff points to a section of his hearing testimony to support his argument that while he plays video games all day, he cannot maintain consistent concentration. Plaintiff testified at the hearing as follows:

> Q. So, what exactly are you doing in your room besides video games?
>
> A. Checking the chat rooms I'm in with my friends and my brother and looking online at - - really nothing in particular, just looking around on the sites that I regularly check.
>
> Q. And again, with these activities, you're able to maintain concentration, chatting on the - - in the - - on--
>
> A. Absolutely not, especially when chatting.
>
> Q. And what about just browsing on the internet?
>
> A. There's no real focus to it in the first place, so if I find something that interest me for at most a half-an-hour.

(AR 35-36.)

However, as Defendant points out, there is evidence in the record that Plaintiff spent

9

hours playing video games which is inconsistent with Plaintiff not having the concentration, persistence, and pace to complete an 8-hour day. There is also evidence in the record to support the ALJ's finding that when motivated, Plaintiff can attend vocational training.[4]

On December 27, 2011, Plaintiff told his mental health provider that he was excited about starting school because he was interested in learning to cook. (AR 329.) He had been trying to stabilize his sleeping patterns by going to bed early and waking up early. (AR 329.) However, he continued to play video games at night and it distracted him and made it difficult for him to fall asleep. (AR 329.) On January 6, 2012, Plaintiff's mental health provider encouraged him to improve his sleeping pattern as he was going to begin the vocational program in 2 weeks and was required to attend daily at a specific time. (AR 325.)

Plaintiff began the culinary program the week of January 16, 2012. (AR 323.) Plaintiff stated on January 20, 2012, that he was struggling with sleeping patterns which was impairing his functioning throughout the day. (AR 323.) The February 1, 2012 progress note indicates that Plaintiff continues to struggle sleeping and Plaintiff stated that his limited rest contributes to his poor functioning throughout the day. (AR 321.)

As of February 7, 2012, Plaintiff was continuing to attend the culinary vocational program. (AR 320.) However, on February 9, 2012, Plaintiff stated that he lacks motivation to complete his vocational school. (AR 319.) On February 10, 2012, Plaintiff stated that he has been feeling a lot of pressure and had suicidal thoughts the day before. (AR 317.) Plaintiff did not have a plan to harm himself and he reported only feeling down about life. (AR 318.) He was having difficulty adjusting to his school schedule. (AR 317.) Plaintiff stated that he lacks motivation and he struggles pushing himself to get up in the morning and attend school. (AR 317.) He reported that he was going to talk to his father and "get some things straight and that he felt better at the end of the appointment. (AR 318.)

On February 14, 2012, Plaintiff's case manager stated that Plaintiff said that he was stopping school because he felt overwhelmed and was not ready to complete an intensive

---

[4] Plaintiff does not present any argument against this specific finding by the ALJ.

program. (AR 316.) On February 17, 2012, Plaintiff had an individual therapy session and stated that he has been feeling a lot of guilt for quitting school and his sleeping patterns have been irregular. (AR 341.) Plaintiff reported that he decided to stop attending the Tulare Adult School, but the instructor is willing to give him some time off until he is fully ready to attend on a daily basis. (AR 314.) On February 24, 2012, Plaintiff stated that he feels agitated and strained in cooking school, but calm and mellow outside his school. (AR 258, 345.)

On March 23, 2012, Plaintiff's mother stated that he stays in his room all the time and plays video games. (AR 256, 343.) On May 1, 2012, Plaintiff was staying with his aunt in San Diego, but the internet reception was not great so he was upset because he could not play his video games and did not know how to enjoy himself without using electronics. (AR 364.) On May 12, 2012, Plaintiff stated that his sleep schedule is abnormal because he stays up during the night and does not fall asleep until 3 or 4 in the morning. (AR 362.) He plays video games or chats with people at night and he does not have any motivation to go to school. (AR 362.) On June 12, 2012, Plaintiff reported that he is tired due to staying up all night playing his video games. (AR 356.)

In Plaintiff's January 7, 2013 function report, he states that he does not feel he can do anything except video games and that "if I can't can't beat game I give up." [sic] (AR 204.) He says that he plays video games and talks to people on the internet from the time he wakes up until he goes to bed. (AR 208.) In the section explaining how his conditions affect him, he states that he cannot concentrate on anything except video games. (AR 209.) He also states that he did not complete the school program because he was afraid of failure or embarrassment. (AR 211.)

On January 7, 2013, Plaintiff's aunt, Janie Sanchez, completed a third party function report. (AR 190-198.) Ms. Sanchez stated that Plaintiff has very poor concentration except for his video games. (AR 195.) Plaintiff cannot pay attend for long and he blocks out when people talk to him. (AR 195.) He does not finish what he starts except for video games and he will break things or stab the computer if he is losing. (AR 195.)

Although Plaintiff offers a different interpretation of the evidence, where the ALJ's

1 interpretation is rational, it is not this Court's function to second guess the ALJ's conclusions and substitute the Court's judgment for the ALJ's. See Burch, 400 F.3d at 679. Therefore, the Court finds that there is substantial evidence to support the ALJ's finding that Plaintiff's ability to spend hours playing video games or, when motivated, attend vocational training is inconsistent with not having the concentration, persistence, and pace to complete an 8-hour day. Thus, the Court finds that the ALJ provided a specific and legitimate reason supported by substantial evidence for rejecting Dr. Izzi's opinion.

2. <u>Inability to Attend to Usual Work Situations Regarding Attendance and Safety is Inconsistent with Plaintiff's Ability to Participate in a Culinary Vocational Class</u>

The ALJ considered that Dr. Izzi opined that Plaintiff could not attend to usual work situations regarding attendance and safety. (AR 17, 377.) The ALJ found this inconsistent with Plaintiff's ability to participate in a culinary vocational class, which he dropped "not because of safety issues or inability to appear at class on time, but rather because it was 'hard' for him to push himself to get up in the morning ([Plaintiff] usually sleeps during the day and is awake at night)." (AR 16-17.)

Plaintiff argues that the ALJ erred in finding that the only reason that Plaintiff could not attend culinary vocational class was because it was hard for him to get up in the morning. Plaintiff asserts that a close review of the record shows that he only attended culinary school for 2 months and he became overwhelmed with having to attend school and he became suicidal when he was forced to go to school.[5] (AR 314, 317-318.) Defendant counters that Plaintiff dropped the culinary program because he did not feel ready to complete an intensive program and not because of safety issues or inability to appear to class on time.

While Plaintiff indicated once that he was agitated and strained in culinary school and at another time that he did not complete the culinary program because he was afraid of failure or embarrassment, he also stated that he lacks motivation and he has a hard time pushing himself to

---

[5] While Plaintiff contends that he never had any friends in school, he was paranoid, and he would constantly get into fights, he did not testify that this same behavior occurred during his time at the culinary vocational school. Plaintiff testified at the hearing that when he was younger and in middle school he never had any friends in school, was paranoid, and would constantly get into fights. (AR 40.)

12

get up in the morning and attend school. (AR 211, 258, 317, 345, 362.) Plaintiff slept during the day until 3 or 4 p.m. and went to bed between 3 a.m. and 5 a.m. and he was tired because he played video games all night. (AR 208, 256, 343, 356, 362.)

On December 22, 2011, Plaintiff stated that he was having trouble establishing a consistent sleeping pattern. (AR 331.) On December 27, 2011, Plaintiff stated that he had been trying to stabilize his sleeping patterns by going to bed early and waking up early, but he continued to play video games at night and it distracted him and made it difficult for him to fall asleep. (AR 329.) On January 6, 2012, Plaintiff's mental health provider encouraged Plaintiff to improve his sleeping pattern as he was going to begin the vocational program in 2 weeks and was required to attend daily at a specific time. (AR 325.)

The January 20, 2012 progress note indicates that Plaintiff began the culinary program that week and that he was struggling with sleeping patterns which caused impaired functioning throughout the day. (AR 323.) The February 1, 2012 progress note indicates that Plaintiff continues to struggle sleeping and Plaintiff stated that his limited rest contributes to his poor functioning throughout the day. (AR 321.) On February 10, 2012, Plaintiff stated that he has been feeling a lot of pressure and that he was having difficulty adjusting to his school schedule. (AR 317.) Plaintiff stated that he lacks motivation and it is hard for him to push himself to get up in the morning and attend school. (AR 317.)

The record shows that Plaintiff usually slept during the day and was awake at night and that Plaintiff was struggling with getting up in the morning. (AR 256, 317, 321, 323, 325, 329, 331, 343, 356.) As the ALJ's interpretation is rational, the Court will not second guess the ALJ's conclusions and substitute the Court's judgment for the ALJ's. See Burch, 400 F.3d at 679. Therefore, the Court finds that there is substantial evidence to support the ALJ's finding that Plaintiff's ability to participate in a culinary program which he dropped because it was hard for him to push himself to get up in the morning is inconsistent with an inability to attend to usual work situations regarding attendance and safety. Thus, the Court finds that the ALJ provided a specific and legitimate reasons supported by substantial evidence for rejecting Dr. Izzi's opinion.

///

3. <u>A Limited Ability to Get Along with Peers or Be Supervised is Properly Translated into Occasional Public Contact with the Ability to Frequently Respond Appropriately to Coworkers</u>

The ALJ considered that Dr. Izzi opined that Plaintiff's ability to get along with peers and to be supervised was limited. (AR 16, 377.) Plaintiff argues that the ALJ rejected Dr. Izzi's opinion that Plaintiff had a limited ability to get along with others. However, as Defendant points out, the ALJ actually translated this limitation into the RFC by limiting Plaintiff to occasional public contact and finding that Plaintiff can frequently respond appropriately to coworkers.

The Ninth Circuit has held that an ALJ may translate assessed limitations into a residual functional capacity assessment without repeating each functional limitation verbatim. <u>Stubbs–Danielson v. Astrue</u>, 539 F.3d 1169, 1173–74 (9th Cir. 2008) (holding that an ALJ's RFC assessment that a claimant could perform simple tasks adequately captured restrictions related to concentration, persistence, or pace, because the assessment was consistent with the medical evidence). The RFC findings need not be identical to the relevant limitations but must be consistent with them. <u>Turner v. Comm'r of Soc. Sec.</u>, 613 F.3d 1217, 1223 (9th Cir. 2010).

The ALJ noted that Dr. Izzi's opinion that Plaintiff had a limited ability to get along with others was consistent with Plaintiff's propensity to spend time alone in his room, but Plaintiff also had the ability to attend and participate in group therapy, live with others, spend time with his online friends and family, and spend time going to lunch and shopping with his aunt. (AR 16, 35-37, 190-194, 275, 277, 279, 292, 300-303, 314, 330-332, 355, 357-362.) The ALJ limited Plaintiff to occasional public contact with frequent coworker interaction because while Plaintiff admitted to spending little time with others in person, he had the ability to chat with his online friends and family members, have a potential significant other online, attend group therapy, and spend time with his aunt. (AR 17, 35-37, 190-194, 275, 277, 279, 292, 300-303, 314, 330-332, 355, 357-362.)

The Court finds that there is substantial evidence in the record to support the ALJ's finding that Dr. Izzi's opinion that Plaintiff has a limited ability to get along with peers or to be supervised translates into occasional public contact with Plaintiff being able to frequently

14

respond appropriately to coworkers. Thus, the Court finds that the ALJ did not err in giving partial weight to Dr. Izzi's opinion. The Court next discusses whether the ALJ properly gave partial weight to the opinion of Dr. Campbell and Dr. Garcia.

### B. The ALJ Properly Gave the Opinion of Dr. Campbell and Dr. Garcia Partial Weight

The ALJ recognized that Dr. Campbell and Dr. Garcia opined that Plaintiff had the mental RFC to perform simple, routine tasks. (AR 17, 55-56, 67-68.) The ALJ found that Plaintiff's ability to perform simple, routine tasks was consistent with evidence that Plaintiff could read and spell at a twelfth grade level, perform math at an eighth grade level, prepare some food, and attend school. (AR 17.) The only part of Dr. Campbell and Dr. Garcia's opinion that the ALJ rejected was the part for social limitations. (AR 17.) The ALJ felt that Dr. Campbell and Dr. Garcia should have assessed social limitations for Plaintiff, so ALJ limited Plaintiff to occasional public contact with frequent coworker interaction. (AR 17.)

Plaintiff argues that the ALJ should have given less weight to the opinion of Dr. Campbell and Dr. Garcia. He asserts that Dr. Campbell's and Dr. Garcia's opinion is not supported by the evidence, contains mere speculation, and does not provide any meaningful analysis about why it is entitled to more weight than Dr. Izzi's opinion. Defendant counters that the ALJ permissibly gave partial weight to the opinion of Dr. Campbell and Dr. Garcia that Plaintiff could perform simple, routine tasks.

Plaintiff contends that the opinion of Dr. Campbell and Dr. Garcia conflicts with the record and is internally inconsistent. Plaintiff argues that because Dr. Izzi's examination revealed memory deficits, it was wrong for Dr. Campbell and Dr. Garcia to find no memory and understanding limitations. Plaintiff points out that Dr. Izzi's examination revealed that Plaintiff's immediate memory was in the first percentile (within the extremely low range) and his visual memory was in the .2 percentile (within the extremely low range). (AR 375-376.) However, Dr. Izzi's examination also revealed a working memory index in the twenty-third percentile. (AR 375.) There are numerous entries in the record that Plaintiff has an intact memory. (AR 252, 256, 258, 260-265, 343, 345, 347-349, 352.) In addition, while Dr.

Campbell and Dr. Garcia did not find any understanding and memory limitations as part of their RFC assessment, they did limit Plaintiff to simple, routine tasks. (AR 17, 55-56, 67-68.) Dr. Izzi even found that Plaintiff could perform simple and repetitive tasks in addition to the finding that Plaintiff's short term memory deficits would limit his ability to perform complex tasks. (AR 376.)

Plaintiff asserts that Dr. Campbell and Dr. Garcia contradicted themselves by responding "[y]es" for whether Plaintiff has sustained concentration and persistence limitations, but then responding that there was "[n]o evidence of limitation in this category" for Plaintiff's ability to maintain attention and concentration for extended periods. (AR 55, 67-68.) However, ability to maintain attention and concentration for extended periods is not the only limitation in the area of sustained concentration and persistence limitations. (AR 55, 67-68.) In the area of sustained concentration and persistence limitations, Dr. Campbell found that Plaintiff was moderately limited in the ability to sustain an ordinary routine without special supervision and the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (AR 55.) The narrative section for the sustained concentration and persistence limitations, which is Dr. Campbell's RFC, indicates that Plaintiff is capable of simple, repetitive tasks and is limited by low motivation, but not by ability. (AR 55.) Therefore, Dr. Campbell and Dr. Garcia did not contradict themselves in regards to sustained concentration and persistence limitations.

Plaintiff also contends that Dr. Campbell and Dr. Garcia did not provide support explaining their opinion for concentration and persistence limitations. However, Dr. Campbell and Dr. Garcia explained that Plaintiff is limited by low motivation and not by ability. (AR 55.) The record supports the finding that Plaintiff is limited by low motivation. (AR 252-253, 306, 310, 317, 319, 354, 359-360, 362.)

As the ALJ found, the record shows that Plaintiff's ability to read and spell at a twelfth grade level and do math at an eighth grade level, prepare food, and attend school is consistent with the ability to perform simple and routine tasks. (AR 206, 314, 316-323, 373, 376.)

Therefore, the Court finds that the ALJ properly gave partial weight to the opinion of Dr. Campbell and Dr. Garcia. Accordingly, the ALJ did not err in her evaluation of the opinions of Dr. Campbell, Dr. Garcia, and Dr. Izzi.

## V.

## CONCLUSION AND ORDER

Based on the foregoing, the Court finds that the ALJ did not err in evaluating the opinions of Dr. Izzi, Dr. Campbell, and Dr. Garcia.

Accordingly, IT IS HEREBY ORDERED that Plaintiff's appeal from the decision of the Commissioner of Social Security is DENIED. It is FURTHER ORDERED that judgment be entered in favor of Defendant Commissioner of Social Security and against Plaintiff George Scott Fast. The Clerk of the Court is directed to CLOSE this action.

IT IS SO ORDERED.

Dated: **February 13, 2018**

UNITED STATES MAGISTRATE JUDGE